UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JIMMY LOZANO,

          Petitioner,      17-cv-357 (JGK)

   - against -             MEMORANDUM OPINION AND
                                  ORDER
UNITED STATES OF AMERICA,

          Respondent.

**JOHN G. KOELTL**, District Judge:

    Petitioner Jimmy Lozano and his mother, natives of the Dominican Republic, entered the United States as lawful permanent residents when Lozano was twelve years old. When Lozano was nineteen, his mother became a naturalized United States citizen. Lozano thereafter applied for a passport claiming derivative citizenship. The United States Department of State (the "State Department") approved Lozano's application, incorrectly as it turned out, and issued him a valid United States passport.

    Lozano later pleaded guilty in November, 2004, to one count of conspiracy to commit robbery in violation of 18 U.S.C. § 1951, and this Court entered a judgment of conviction against him in April, 2005. The Court did not inform Lozano of any immigration consequences of his conviction before accepting his plea. At that time, it appears that the Court, the Government, and Lozano all believed that Lozano was a naturalized citizen of

the United States. See 22 U.S.C. § 2705(1) (2000) (providing that a valid passport issued by the State Department is conclusive proof of United States citizenship). However, prior to his sentencing, the Probation Department reported that Lozano was not a citizen of the United States, and the Court required as a condition of supervised release that Lozano follow the immigration laws and comply with the immigration authorities.

More than a decade later, the State Department sent Lozano a letter informing him that his passport had been issued in error. The State Department informed Lozano that he was never entitled to derivative United States citizenship because he was over the age of eighteen when his mother was naturalized. As a result, Lozano remained a lawful permanent resident, subject to removal. The Department of Homeland Security (the "DHS") then served Lozano with notice of removal proceedings based on his robbery conviction.

Lozano now petitions this Court for a writ of error coram nobis vacating his robbery conviction on the ground that his guilty plea was involuntary and unknowing because he did not know that his conviction could be a basis for removing him from the United States. For the reasons that follow, Lozano's petition is **denied**.

# I.

Jimmy Lozano was born in the Dominican Republic on February 9, 1981. ECF No. 3, at 2 ¶9. In 1993, Lozano, then twelve, and his mother entered the United States as lawful permanent residents. ECF No. 3, at 2 ¶11; ECF No. 4, at 2 ¶¶9, 11, 12. Lozano has resided in the United States ever since. ECF No. 3, at 7 ¶40. He returned to the Dominican Republic to visit only once, in 1995. ECF No. 3, at 8 ¶48.

Lozano's mother became a naturalized United States citizen on July 24, 2000. ECF No. 3, at 2 ¶15; ECF No. 4, at 2 ¶14. Two years later, Lozano sought derivative citizenship through his mother by applying for a United States passport. ECF No. 3 at 2 ¶¶14, 16. Lozano represents that he provided complete and accurate information in his passport application, id. at 2-3 ¶16, and the Government has not disputed that representation.

The State Department issued Lozano a passport on November 4, 2002. ECF No. 2 ex. 1; ECF No. 3 ¶17. Lozano never filed an application for United States citizenship independent of his mother. See ECF No. 3 at 2-3 ¶¶12-16.

Some months later, Lozano was arrested pursuant to a federal criminal complaint alleging that he conspired to rob narcotics traffickers in the Bronx, New York. ECF No. 2 ex. 2; ECF No. 3, at 3 ¶¶18, 19. Lozano was indicted in the Southern District of New York on one count of conspiracy to commit

3

robbery in violation of 18 U.S.C. § 1951. ECF No. 3, at 3-4 ¶19. Lozano agreed to plead guilty to that charge. Id. at 4-5 ¶23.

On November 12, 2004, this Court held a hearing pursuant to Federal Rule of Criminal Procedure 11 to consider Lozano's application to plead guilty pursuant to a plea agreement with the Government. See ECF No. 2 ex. 3. The Court explained to Lozano the nature of the charge against him, as well as the constitutional rights he would waive and the punishments he would face upon pleading guilty. Id. at 3-19. The Court informed Lozano that his guilty plea would "deprive [Lozano] of valuable civil rights, such as the right to vote, the right to hold public office, the right to serve on a jury and the right to possess any kind of firearm." Id. at 12. The following exchange then occurred:

> THE COURT: There are no other collateral consequences that I should mention, I take it?
>
> [GOVERNMENT]: I believe the defendant is a U.S. citizen.
>
> [DEFENSE ATTORNEY]: That's correct.

Id. at 12-13. After Lozano affirmed that he understood the consequences of pleading guilty, the Court accepted his plea. Id. at 24.

On April 13, 2005, Lozano appeared for a sentencing hearing regarding his plea of guilty to robbery. Before that hearing, the Court and the parties reviewed the Probation Department's

4

Presentence Investigation report (the "PSR"), dated March 31, 2005. Presentence Investigation Report, United States v. Lozano, No. 03-cr-1466 (S.D.N.Y. Mar. 31, 2005). The PSR listed Lozano's citizenship as "Dominican Republic." Id. at 2. The PSR also stated: "[Lozano] was born in the Dominican Republic and has reportedly lived in New York since 1993. . . . Information obtained from the Bureau of Immigration and Customs Enforcement indicates that [Lozano] is a legal permanent resident of the U.S. and lists his official date of entry as 1/31/98." Id. at 9 ¶38. The PSR does not specify where Lozano "list[ed] his official date of entry as 1/31/98," and the parties represent that the PSR's description of his date of entry is incorrect because Lozano actually entered the United States with his mother in 1993.

At the sentencing hearing, Lozano, his counsel, and the Government all stated that they reviewed the PSR and none raised any objection to the information therein regarding Lozano's immigration status. Tr. of Sentencing Hr'g 3:9-16, 7:6-11, 7:24-8:3, United States v. Lozano, No. 03-cr-1466 (S.D.N.Y. Apr. 13, 2005) (ECF No. 29). The Court then sentenced Lozano principally to thirty-three months' imprisonment with three years' supervised release and imposed as a condition of Lozano's supervised release that he "follow the immigration laws and comply with the immigration authorities." Id. at 12:10-11; see

5

ECF No. 2 ex. 4, at 2, 3. The Court received no follow-up communications regarding Lozano's PSR.

Lozano served the full sentence for his federal robbery conviction. ECF No. 3, at 5 ¶25. He was released from federal custody on February 17, 2006. Id. He continued to reside in the United States. Id. at 8, ¶48.

Lozano's passport expired on November 3, 2012. ECF No. 2 ex. 1. He applied to renew his passport in 2013. ECF No. 3, at 5 ¶26. Again, Lozano represents that he provided truthful information in this application, id., and the Government has not disputed that representation. The State Department issued Lozano a renewal passport on November 21, 2013. ECF No. 2 ex. 6; ECF No. 3, at 5 ¶26.

In January, 2015, Lozano was arrested and indicted in the District of Vermont for possession of Oxycodone with the intent to distribute. ECF No. 3, at 5 ¶27. He pleaded guilty to conspiracy in violation of 21 U.S.C. § 846 to distribute narcotics in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and was remanded to federal custody awaiting sentencing. Id. at 5 ¶28. On June 27, 2016, the United States District Court for the District of Vermont sentenced Lozano principally to time served with three years' supervised release. ECF No. 3, at 5 ¶29.

Immediately upon his release from federal custody in Vermont, DHS officials served Lozano with a notice to appear for removal proceedings, alleging that he is deportable based on his robbery conviction in the Southern District of New York. ECF No. 2 ex. 7, at 1; ECF No. 3, at 6 ¶33; see 8 U.S.C. § 1227(a)(2)(A)(i)(II). Lozano told the DHS officials that he was a United States citizen. ECF No. 3, at 6 ¶35. One of the DHS officials then told Lozano that the State Department had sent him a letter dated October 22, 2015 informing him that he was not a citizen. ECF No. 3, at 6 ¶36; see ECF No. 2 ex. 5, at 1. Lozano replied that he had no knowledge of this letter. ECF No. 3, at 6 ¶32. The DHS officials then took Lozano into custody, where he remains, id. at 5 ¶30, 7 ¶38; proceedings to remove Lozano to the Dominican Republic have begun. See id. at 6-7, ¶¶37-38.

Lozano was provided with a copy of the October 22, 2015 State Department letter during his removal proceedings. Id. at 6 ¶37; see ECF No. 2 ex. 5. The letter was addressed to Lozano's Bronx apartment and signed by the State Department's Bureau of Consular Affairs. ECF No. 2 ex. 5, at 1, 2. In the letter, the State Department explains that it issued Lozano's renewal passport "in error" and was revoking the passport because he was not a United States citizen. Id. at 1; see 22 U.S.C. § 212 (2000); 22 C.F.R. § 51.2(a) (2002). According to the State

7

Department, federal law at the time Lozano's mother was naturalized provided that a child of a naturalized parent was eligible for derivative citizenship only if the child was under the age of eighteen when the parent was naturalized. ECF No. 2 ex. 5, at 1; see Immigration and Nationality Act, ch. 477, § 321(a)(4), 66 Stat. 163, 245 (1952), as amended by Act of October 5, 1978, Pub. L. No. 95-417, § 5, 92 Stat. 917, 918, repealed by Child Citizenship Act of 2000, Pub. L. No. 106-395, § 103(a), 114 Stat. 1631, 1632. The State Department wrote that it discovered recently that Lozano was over the age of eighteen years when his mother was naturalized. ECF No. 2 ex. 5, at 1. As a result, the State Department concluded that Lozano was never entitled to United States citizenship and his passports were issued in error. Id. The letter does not contain any allegation that Lozano provided false or misleading information in his passport applications. See id.

This petition for a writ of error coram nobis vacating Lozano's 2005 robbery conviction followed. ECF No. 1.

## II.

"A writ of error coram nobis is an 'extraordinary remedy,' United States v. Morgan, 346 U.S. 502, 511 (1954), typically available only when habeas relief is unwarranted because the petitioner is no longer in custody." Kovacs v. United States, 744 F.3d 44, 49 (2d Cir. 2014). The writ is "not a substitute

for appeal, and relief . . . is strictly limited to those cases in which errors of the most fundamental character have rendered the proceeding itself irregular and invalid." Foont v. United States, 93 F.3d 76, 79 (2d Cir. 1996) (internal quotation marks and ellipsis omitted). To secure coram nobis relief, a petitioner "must demonstrate that 1) there are circumstances compelling such action to achieve justice, 2) sound reasons exist for failure to seek appropriate earlier relief, and 3) the petitioner continues to suffer legal consequences from his conviction that may be remedied by granting of the writ." Kovacs, 744 F.3d at 49 (quoting Foont, 93 F.3d at 79). See also Chacko v. United States, No. 04cv2258 (JGK), 2005 WL 1388713, at *2-*3 (S.D.N.Y. June 8, 2005).

### III.

Lozano has failed to satisfy the first requirement of coram nobis relief. Justice does not require the vacatur of Lozano's judgment of conviction for robbery because his guilty plea does not suffer from any actionable legal infirmity.

Lozano argues that his 2005 plea suffers from a single legal defect: that it was involuntary and unknowing in violation of the Fifth Amendment due process guarantee. See Brady v. United States, 397 U.S. 742, 748 (1970); Boykin v. Alabama, 395 U.S. 238, 242-43 (1969). The gist of Lozano's argument is that his plea was not a knowing and voluntary waiver of his right to

9

trial because he was unaware that he was not a citizen of the United States and that his conviction could be used to remove him from the United States.

Lozano stresses that he did not know his status because the Government made a mistake in issuing him a passport to which he was not entitled. Lozano does not claim that the Government's mistake is a basis to vacate his guilty plea on the grounds of substantive dues process under the Fifth Amendment, namely that the Government's conduct was so egregious that it "shocks the conscience." See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 (1998). There is no contention that the Government's error in issuing the original passport was anything other than a bureaucratic mistake that allowed Lozano to live in the United States for many years.

Nor does Lozano claim that his counsel was ineffective for failing to catch the Government's error in issuing a passport to Lozano. Lozano's current counsel has stated repeatedly that Lozano is not pursuing a Sixth Amendment ineffective assistance of counsel claim. ECF No. 17, at 1-2; see Strickland v. Washington, 466 U.S. 668, 687 (1984).[1] Nevertheless, the Court

---

[1] When the Court raised the issue of the March 31, 2005 PSR's description of Lozano's citizenship and immigration status with the parties at a conference held on October 11, 2017, Lozano's counsel reiterated that Lozano was not claiming ineffective assistance of counsel based on Lozano's legal representation in connection with his initial plea and sentence. This concession was understandable in view of the statement of the PSR, which could have been pursued before the

10

has considered cases from both the Fifth and Sixth Amendment contexts because the relevant legal principles in those two areas are linked conceptually. See Hill v. Lockhart, 474 U.S. 52, 56 (1985) ("Where . . . a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." (internal quotation marks omitted)).

Lozano's only claim is that his plea was not a knowing and voluntary plea, and thus violated the Fifth Amendment, because he was unaware that he was not a citizen and that his conviction could be used to remove him from the United States.

**A.**

To sustain a Fifth Amendment claim, Lozano must first establish that the Due Process Clause contains a right to accurate information regarding the immigration consequences of a conviction prior to pleading guilty.

"It is a settled principle of federal constitutional law that a guilty plea violates due process and is therefore invalid if not entered voluntarily and intelligently." United States v. Youngs, 687 F.3d 56, 59 (2d Cir. 2012). A guilty plea is

---

one-year statute of limitations for motions pursuant to 28 U.S.C. § 2255 had expired. See 28 U.S.C. § 2255(f).

11

voluntary only if the defendant has been made "fully aware of the <u>direct</u> consequences" of the conviction prior to the entry of the plea. Id. at 60 (quoting Brady, 395 U.S. at 755). "Collateral" consequences, by contrast, "need not be explained to the defendant in order to ensure that the plea is voluntary." United States v. U.S. Currency in the Amount of $228,536.00 ("$228,536"), 895 F.2d 908, 915 (2d Cir. 1990). "[D]irect consequences [are] those that have a definite, immediate and largely automatic effect on the range of the defendant's punishment, and any other consequence is merely collateral." Youngs, 687 F.3d at 60 (internal quotation marks omitted).

Courts rely on a similar distinction between direct and collateral consequences in the Sixth Amendment ineffective assistance of counsel context. Generally, an attorney's "[f]ailure to advise [the defendant] of a collateral penalty cannot be held to be below an objective standard of reasonableness." Torrey v. Estelle, 842 F.2d 234, 237 (9th Cir. 1988); accord Russo v. United States, No. 97-2891, 1999 WL 164951, at *2 (2d Cir. Mar. 22, 1999) (summary order). See also Hill, 474 U.S. at 60 (leaving open the question whether advice regarding a collateral consequence must meet the Sixth Amendment standard). The test for whether a consequence is direct or collateral is the same for both the Fifth and Sixth Amendments. See Torrey, 842 F.2d at 236-37.

12

It is not clear whether the deportation consequences of a criminal conviction are considered direct or collateral for purposes of the Fifth Amendment.

Prior to the Supreme Court's decision in Padilla v. Kentucky, 559 U.S. 356 (2010), there was a consensus among federal courts that immigration consequences were to be considered collateral for both Fifth Amendment due process and Sixth Amendment right to counsel purposes. There was therefore no obligation to advise a defendant of such consequences. See, e.g., Broomes v. Ashcroft, 358 F.3d 1251, 1256 (10th Cir. 2004); United States v. Fry, 322 F.3d 1198, 1200-01 (9th Cir. 2003); United States v. Gonzalez, 202 F.3d 20, 25 (1st Cir. 2000); $228,536, 895 F.2d at 915; United States v. Yearwood, 863 F.2d 6, 7-8 (4th Cir. 1988).

Padilla called that consensus into question. Padilla presented the issue whether the Sixth Amendment requires counsel to inform a defendant of the immigration consequences of a criminal conviction prior to a guilty plea. Id. at 360. The Supreme Court noted that many lower courts require counsel to review with a defendant only direct, not collateral, consequences. Id. at 364-65 & n.9. But the Court found that framework unhelpful to decide the issue presented because immigration consequences defy the direct-collateral paradigm. Id. at 365. The Court explained that deportation "is not, in a

strict sense, a criminal sanction," but it is "a particularly severe penalty" that is "intimately related to the criminal process." Id. at 365 (internal quotation marks omitted). "[R]ecent changes in our immigration law have made removal nearly an automatic result for a broad class of noncitizen offenders," the Court continued, rendering attempts to divorce "the penalty from the conviction in the deportation context" "most difficult." Id. at 366. As a result, the Court held that, pursuant to the Sixth Amendment, counsel must inform a defendant "whether [a] plea carries a risk of deportation" for a plea to be valid. Id. at 374.

The United States Court of Appeals for the Second Circuit has suggested implicitly that Padilla may extend to the Fifth Amendment context. In United States v. Youngs, the Court of Appeals confronted a Fifth Amendment challenge by a defendant who argued that his plea of guilty to child pornography offenses was involuntary because the district court did not assure that the defendant was aware of the possibility that the Government could seek civil commitment upon his release from prison. 687 F.3d at 58; see 18 U.S.C. § 4248(a). The Court of Appeals rejected that challenge, contrasting the deportation consequences in Padilla to the possibility of civil commitment for sex offenders. Youngs, 687 F.3d at 62-63. The court explained that in contrast to deportation, which is "virtually

14

inevitable" and "nearly automatic" upon the entry of a judgment of conviction against an alien, civil commitment is uncertain and subject to a wide range of government discretion. Id. Those differences demonstrated that the possibility of civil commitment is a collateral consequence for Fifth Amendment purposes, which need not be explained to a defendant prior to the entry of a guilty plea. Id. See also United States v. Couto, 311 F.3d 179, 188-91 (2d Cir. 2002) (questioning whether deportation consequences should be treated as collateral to a criminal conviction in light of current immigration law).

The Advisory Committee on Criminal Rules has indicated a similar, although more limited, view of Padilla. The Committee, citing Padilla, recently amended Rule 11 to require courts to provide a "generic warning" regarding immigration consequences of a conviction. Fed. R. Crim. P. 11 advisory committee's note to 2013 amendment. The Committee stopped short of requiring courts to provide "specific advice concerning the defendant's individual situation." Id. Rule 11 now requires courts to notify a pleading defendant "that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future." Fed. R. Crim. P. 11(b)(1)(O). See also United States v. Harrington, 354 F.3d 178, 183 (2d Cir. 2004) ("Because of the significance of ensuring that guilty pleas are made

voluntarily and with knowledge of the alternatives, [the court of appeals] generally requires strict adherence to Fed. R. Crim. P. 11 . . . ." (internal quotation marks omitted)).

While these authorities indicate some support for Lozano's argument that the Fifth Amendment now contains a right to accurate deportation information prior to the entry of a guilty plea, Lozano has identified no authority that endorses squarely such a rule. In Youngs, the Court of Appeals for the Second Circuit noted that Padilla's holding was limited to the requirement under the Sixth Amendment for counsel to advise a defendant of the deportation consequences of a guilty plea. 687 F.3d at 62. The court noted that the responsibilities of counsel under the Sixth Amendment are greater than the responsibilities of a court under the Fifth Amendment, and that Padilla had not done away entirely with the distinction between direct and collateral consequences. Id. Similarly, in United States v. Delgado-Ramos, 635 F.3d 1237, 1240-41 (9th Cir. 2011) (per curiam), the Court of Appeals for the Ninth Circuit rejected an argument similar to Lozano's, concluding instead that Padilla "sheds no light on the obligations a district court may have under Rule 11 and due process." Delgado-Ramos, 635 F.3d at 1241.

**B.**

Whatever impact Padilla may have had on a Fifth Amendment right to be advised of the immigration consequences of a plea,

16

Padilla cannot help Lozano. That is so because the Padilla decision cannot be applied retroactively, and Lozano's conviction became final long before the Supreme Court decided Padilla.

"[N]ew constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." Teague v. Lane, 489 U.S. 288, 310 (1989); see Kovacs, 744 F.3d at 50. A rule is new if it "was not dictated by precedent existing at the time the defendant's conviction became final." Teague, 489 U.S. at 301. "[A] holding is not so dictated . . . unless it would have been apparent to all reasonable jurists." Chaidez v. United States, 568 U.S. 342, 347 (2013) (internal quotation marks omitted).

In Chaidez v. United States, the Supreme Court held that the Sixth Amendment rule announced in Padilla was new and therefore does not have retroactive effect. 568 U.S. at 357. The Court explained that pre-Padilla precedent did not dictate that the Sixth Amendment contained a right to be informed by counsel regarding deportation. Id. at 350-52. To the contrary, most of the lower-court precedent predating Padilla held that " 'counsel's failure to inform a defendant of the collateral consequences of a guilty plea is never' a violation of the Sixth Amendment." Id. at 350 (quoting Santos-Sanchez v. United States,

17

548 F.3d 327, 334 (5th Cir. 2008)). See also id. at 350 n.7 (collecting cases).

Chaidez underlines why Lozano has no valid claim in this case. Chaidez definitively held that Padilla was not retroactive and could not benefit any defendant, such as Lozano, whose conviction became final before Padilla was handed down. But Lozano attempts to rely on an argument even more favorable to defendants than the rule recognized in Padilla. Lozano urges that the Fifth Amendment required that he have knowledge of the immigration consequences of his guilty plea, not simply that the Sixth Amendment required his defense counsel to provide such advice. If such a rule could be applied to Lozano's pre-Padilla conviction, it would undercut Chaidez. Defendants who pleaded guilty prior to Padilla could argue that their conviction should be vacated under the Fifth Amendment if they were unaware of the immigration consequence of their pleas. It would not matter that their lawyers had failed to advise them of the deportation consequences of their pleas (an argument on which they could not rely because Padilla is not retroactive) because they could always argue that their lack of knowledge invalidated their pleas under the Fifth Amendment. Defendants who pleaded guilty prior to Padilla cannot make such an end-run around the lack of retroactivity of Padilla.

## C.

Finally, United States v. Cuoto, 311 F.3d 179, is not a basis to grant Lozano's petition. That case stands for the proposition that "an affirmative misrepresentation by counsel as to the deportation consequences of a guilty plea is . . . objectively unreasonable" under the Strickland v. Washington Sixth Amendment standard. Id. 188. Extrapolating that rule to the Fifth Amendment, Lozano argues that his due process rights were violated because the State Department (not counsel) misled him affirmatively regarding his citizenship status.

This argument is unpersuasive. Cuoto stands for the unexceptional proposition that, as part of an attorney's obligation under the Sixth Amendment to provide effective assistance of counsel in connection with a guilty plea, the attorney cannot make an affirmative misrepresentation to the defendant. Cuoto says nothing about a Fifth Amendment right to accurate information about the immigration consequences of a guilty plea. Moreover, the error by the State Department in issuing a passport to Lozano was unconnected to the guilty plea proceeding. It was part of the background information that Lozano had in making his decision to plead guilty. This argument reduces to a repackaged argument that the Fifth Amendment requires that a defendant have accurate information about the immigration consequences of his guilty plea -- an argument that,

19

if applied to pre-Padilla convictions, would undercut Chaidez, as explained above.[2]

**CONCLUSION**

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the foregoing reasons, Lozano's petition for a writ of coram nobis is **denied**. The Clerk is directed to enter judgment dismissing the petition and closing this case.

**SO ORDERED.**

**Dated:** **New York, New York**
**October 17, 2017**

_____
John G. Koeltl
**United States District Judge**

---

[2] Lozano may not be able to meet the second requirement for coram nobis relief, namely that sound reasons exist for Lozano's failure to seek earlier appropriate relief. Lozano could have pursued the indication in the PSR in 2005 that he was not a citizen. An investigation at that time would have indicated that he was not entitled to citizenship based on his mother's naturalization. However, because the Government has not relied on an argument of untimeliness, the Court will not deny the petition on that basis.